IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

PATRICIA TATUM,
   Plaintiff,

vs.            Case No. 3:04cv316/MCR/EMT

JO  ANNE  B.  BARNHART,
Commissioner of the
Social Security Administration,
   Defendant.

_____/

## REPORT AND RECOMMENDATION

   This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits under Title II of the Act.

   Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.[1]

---

   [1]The court may remand a case for entry of an order awarding benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  Because the evidence in this case does not clearly establish disability, the court should remand for further proceedings.  *See id.* (the general rule is to reverse and remand for additional proceedings).

I.      PROCEDURAL HISTORY

On November 8, 2000, Plaintiff filed an application for disability insurance benefits ("DIB")
under Title II of the  Social Security Act, 42 U.S.C. § 401 *et seq.*, alleging an onset of disability on
May 2, 1998 (*see* Tr. 11).[2]  Plaintiff's application was denied initially and on reconsideration (Tr.
11).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 26).  A hearing
was held on January 6, 2003 (Tr. 230-60), at which Plaintiff was represented by counsel and testified
(Tr. 232-55).  A vocational expert ("VE"), J. Scott Lankford, Ph.D., also testified (Tr. 255-58).  On
May 14, 2003, the ALJ rendered a decision finding that Plaintiff was not under a "disability" as
defined in the Social Security Act (Tr. 11-18).  On August 6, 2004, the Appeals Council of the
Social Security Administration denied Plaintiff's request for review (Tr. 3-5).  The Appeals
Council's action made the ALJ's decision the final decision of the Commissioner, and therefore
subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  Plaintiff's
appeal from the final decision of the Commissioner is now before this court.

II.     FINDINGS OF THE ALJ

The ALJ found that Plaintiff was sixty years old with a ninth grade education (Tr. 11).  Her
past work experience included employment as a meat packager and an optometry assistant (*id.*).
Plaintiff had not engaged in substantial gainful activity since her alleged onset date (Tr. 12).  The
medical evidence indicated that Plaintiff had the severe impairments of degenerative disk disease
of the cervical spine with disk bulging, degenerative arthritis of the lumbar spine, and fibromyalgia
syndrome (Tr. 15).  However, a severe mental impairment was not established (Tr. 13), and Plaintiff
did not have an impairment that met or medically equaled one of the impairments listed in 20 C.F.R.
Part 404, Subpart P, Appendix 1 (Tr. 15).

The ALJ found that the opinion of Plaintiff's treating physician, Dr. Brown, regarding
functional limitations dating from May 1998 was not supported by appropriate clinical evidence and
did not merit controlling evidentiary weight based on the overall evidence of record (Tr. 16).
Additionally, the ALJ determined that Plaintiff's subjective complaints were not fully credible (Tr.

---

[2] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on December 13,
2004 (Doc. 5).

17).   Based on the entire record, the ALJ found that Plaintiff retained the following residual functional capacity: to lift/carry twenty pounds occasionally and ten pounds frequently, to sit or stand/walk with routine rest periods for as many as six of eight hours, and to perform occasional postural activities (Tr. 16).   The ALJ further found that Plaintiff could return to her past relevant work as an optometry assistant (Tr. 17).   Thus, Plaintiff was not under a "disability" as defined in the Social Security Act at any time through May 14, 2003 (Tr. 11, 17, 18).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.   Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).   "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."   Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir.1991).   As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).   Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); Lewis, 125 F.3d at 1439.   The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).   Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps.  The steps are:

1.       If the claimant is performing substantial gainful activity, he is not disabled.

2.       If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.       If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.       If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.       Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.  Personal History

Plaintiff testified at a hearing before the ALJ on January 6, 2003 as follows (Tr. 232-55). She was born on April 14, 1943, making her fifty-nine years old at the time of the hearing (Tr. 234).

She is married, but has no minor children living at home (Tr. 235). She has a ninth grade education and has not received a GED or any vocational or technical training (Tr. 236). She is able to read, write, and do simple arithmetic (*id.*).

Plaintiff last worked at an optical center, and her last day of work was May 2, 1998 (Tr. 236-37). She worked there for approximately nine years (Tr. 240). Her duties included taking patient histories, performing glaucoma and visual checks, staying with patients while they practiced inserting and removing new contacts, handwriting and mailing recall cards, and ordering contact lenses (Tr. 237-39). Plaintiff stopped working at the optical center after an injury at work (Tr. 240). She bent over to make sure a machine was aligned and experienced pain across her lower back (*id.*).

Plaintiff's back pain did not improve, so she went to physical therapy and then to pain management where she received injections (Tr. 241). One injection provided relief for a "couple of days," but the others provided no relief (*id.*). She went to a neurologist for testing, and multiple sclerosis was ruled out (Tr. 241-42). She then returned to physical therapy with a different therapist and also treated with a chiropractor (Tr. 242). The chiropractor helped her spine somewhat, but he was unable to get the soreness "out of the spots," which is when he suggested that Plaintiff may have fibromyalgia (*id.*). Her rheumatologist confirmed the diagnosis of fibromyalgia and treated her with medication until July 2001 (Tr. 243). He also recommended walking and exercise; however, nothing seemed to work (*id.*). Plaintiff heard that Dr. Brown was good with fibromyalgia patients, so she went to see him (*id.*).

At the time of the hearing, Dr. Brown was the only physician Plaintiff was seeing, and his treatment consisted of medication (Tr. 243-44). Plaintiff's testified that her symptoms are no longer confined to her lower back; they are now "all over" (Tr. 242). She also has depression and difficulty sleeping (Tr. 244, 252). The medication has helped some, but most mornings Plaintiff has to sit in the recliner for some time before she can actually do any activity (Tr. 244). Plaintiff experiences constant pain, and it is often so severe she must stay in bed or in a chair or take a hot shower (*id.*). She has constant pain in her hips, shoulders, and neck (Tr. 245). Sitting aggravates her condition (Tr. 250). She can sit in a cushioned chair for a couple hours or so, although she may have trouble getting up, but she cannot sit in a wooden chair for long (Tr. 251). Standing also aggravates her condition (Tr. 252). On a good day, Plaintiff can cook a meal, but nothing large or elaborate (Tr. 246). She can also do light housekeeping (Tr. 247). She takes pain medication every day and takes

more on her "bad" days (*id.*).  In a week, she experiences at least three "bad" days (Tr. 248).

Plaintiff believes she is depressed because at times she withdraws from other people, feels worthless, and has crying spells (Tr. 252-53).  Dr. Brown suggested that she attend a support group and see someone to help her with her depression, but she has not been able to follow up on those suggestions (Tr. 253-54).

On a weekly basis, Plaintiff drives to church, the bank, and the grocery store, all of which are within about seven miles (Tr. 235).  At times Plaintiff does not feel mentally alert enough to drive, so she does not drive (*id.*).

B.      Relevant Medical History

Plaintiff's medical records begin on June 18, 1998, when she underwent an MRI of her cervical spine (Tr. 93).  The radiologist's impressions were: 1) C6-7 minimal right paracentral disk protrusion without any associated nerve root impingement and without cord impingement; 2) C5-6 slight central annular bulge; and 3) cervical cord lesion at C3-4 central dorsal location with associated slight cord atrophy and no pathologic enhancement, which suggested an old pathologic process such as demyelinating[3] disease or remote inflammatory or traumatic injury (Tr. 93).

Plaintiff was seen by neurologist Robert A. Frank, M.D., on July 15, 1998 (Tr. 129).  He had previously seen her in 1995 secondary to symptoms of pressure in her head (*id.*).  In 1995, an MRI scan of the brain was obtained, which was benign, and she was treated with muscle relaxants and "essentially lost to follow up" (*id.*).  She returned in July 1998 stating that in March or April of 1998 she fell at work and landed on her back (*id.*).  She was sore and achy, but had no severe symptoms (*id.*).  However, on May 2, 1998, she was leaning over at work and suddenly had intense discomfort in her low back that she described primarily as pressure (*id.*).  She was able to straighten up with some difficulty (*id.*).  She noted some improvement over time, but continued to have difficulty with her low back and right hip and leg (*id.*).  She also indicated that since May 2, 1998, she was having trouble with her right arm, neck, and shoulder, including tingling in her right hand (*id.*).  At the time

---

[3] A demyelinating disease is any condition that results in damage to the protective covering (myelin sheath) that surrounds nerves in the brain and spinal cord.  Demyelinating Disease, *available at http://www.mayoclinic.com/health/ demyelinating-disease/AN00564* (Last updated May 9, 2005).  Multiple sclerosis is the most common type of demyelinating disease.  *Id.*

of her visit, she was taking Skelaxin[4] and Relafen[5] (Tr. 130).  Plaintiff's physical examination was basically unremarkable (*id.*).  Dr. Frank believed that Plaintiff most likely had a lumbar strain; however, he stated that the significance of the symptoms in her neck and arm were unclear (*id.*).  Dr. Frank planned to further evaluate Plaintiff with laboratory studies and an MRI of the brain (*id.*).

Plaintiff was next seen by Dr. Frank on August 14, 1998 (Tr. 126).  Her brain MRI did not strongly suggest demyelinating disease (*id.*).  Additionally, the cervical lesion was most likely old and of no significant acute consequence (*id.*).  According to Dr. Frank, Plaintiff's concerns regarding her right arm and low back looked to be musculoskeletal and amenable to symptomatic treatment (*id.*).

Plaintiff initially presented to Kurt A. Krueger, M.D., on September 14, 1998 after referral by Dr. Reyes (Tr. 115).  Her primary complaint was low back pain with radiation into both hips, left greater than right, and neck pain with tingling in both hands (*id.*).  Associated symptoms included insomnia and pain waking her during the night (*id.*).  Plaintiff related that she fell at work when she went to sit in a chair, which rolled out from under her, and she hit her buttock and low back on a nearby table (*id.*).  She had some generalized aching, but nothing severe enough to keep her from work (*id.*).  On May 2, 1998, while she was at work bending over a table, she had a sudden sharp pain across her low back (*id.*).  The pain was so severe she could not get up out of a chair, and she had been off of work since that time without improvement (*id.*).  She was seen approximately two days later by Dr. Reyes, who performed the initial diagnostic studies and prescribed medication (*id.*).  Previous treatment modalities included physical therapy, which had not been effective, and oral medications, which had been slightly effective (*id.*).  According to Dr. Krueger, imaging studies revealed mild to moderate degenerative changes, small disk "protrusions" at L4-5 and L5-S1, and a small disk "extrusion" at T11-12 (Tr. 116).  The cervical MRI was not available for review (*id.*).

Upon examination, Dr. Krueger noted that Plaintiff's posture was slightly guarded and she had a definite antalgic gait favoring the left side (*id.*).  She was unable to heel and toe rise on the left side due to increased pain (*id.*).  Range of motion maneuvers revealed that flexion could be achieved

---

[4]Skelaxin is a skeletal muscle relaxant medication.  Skelaxin Oral, *available at http://www.medscape.com/druginfo/* (Last visited January 12, 2006).

[5]Relafen is a non-steroidal anti-inflammatory medication.  Relafen Oral, *available at http://www.medscape.com/druginfo/* (Last visited January 12, 2006).

to 45 degrees before pain was markedly severe, and extension was to 20 degrees before pain was markedly worse (Tr. 117). Palpation revealed specific pain bilaterally over the L4-5 and L5-S1 facet joints, much more so on the left side than the right, and there was mild associated muscle spasm (*id.*). Plaintiff had several other tender areas, but no trigger points were elicited (*id.*). Sensory examination showed decreased sensation over the left inner thigh, with no other dermatomal[6] deficits (*id.*). Motor strength was intact and strong bilaterally, and deep tendon reflexes were equal and normal (*id.*). Straight leg raise was negative (*id.*). Dr. Krueger noted that Plaintiff presented in a straightforward manner without exaggerated pain behavior (Tr. 116).

Dr. Krueger's impression was low back pain secondary to facet syndrome,[7] lumbar degenerative disk disease with small disk protrusions, neck and right upper shoulder girdle pain with bilateral hand tingling, and myofascial pain syndrome in both cervical and lumbar regions (Tr. 117). He provided a prescription for a transcutaneous electrical nerve stimulation ("TENS") unit and scheduled Plaintiff for diagnostic bilateral L5-S1 facet joint injections[8] (*id.*).

On September 22, 1998, Plaintiff returned to Dr. Krueger (Tr. 122). He had reviewed the cervical MRI and noted that it showed a right C6-7 paracentral disk protrusion as well as a C3-4 cord lesion, which he planned to address the next week (*id.*). He noted that the examination of Plaintiff's lower back and extremities was unchanged and performed initial diagnostic placement of bilateral L5-S1 facet joint injections (*id.*). Plaintiff had mild provocation on the left side and marked provocation on the right side (Tr. 122-23).

Plaintiff returned to Dr. Krueger on September 29, 1998 for placement of trial lumbar epidural medications[9] (Tr. 120). He noted that she had previously "trialed" lumbar facet joint

---

[6]Dermatomes are areas on the skin supplied by sensory fibers of the spinal nerves. *See http://www.mercksource. com/* (Last visited January 23, 2006).

[7]Facet joints are joints between the posterior portion of two vertebrae. Lumbosacral Facet Syndrome, *available at http://www.emedicine.com/sports/topic65.htm* (Last updated July 22, 2004). Facet joint syndrome is characterized by pain originating from the facet joints. *Id.*

[8]A diagnostic facet joint injection is used to determine whether the facet joint is generating pain. Patient Information Spinal Injections, *available at http://www.spinalneurosurgery.com/spinal_injection.htm* (Last visited January 12, 2006).

[9]With a lumbar epidural injection, steroids are injected into the epidural space to decrease nerve root inflammation and resulting pain. Patient Information Spinal Injections, *available at http://www.spinal neurosurgery.com/spinal_injection.htm* (Last visited January 12, 2006).

injections without improvement (*id.*).

On October 6, 1998, Plaintiff saw Dr. Krueger for repeat placement of selective lumbar epidural medications (Tr. 111). She had moderate improvement from her overall back pain after the first injection, but continued to have fairly severe left hip pain with distal radiation (*id.*). Dr. Krueger had anticipated addressing her neck problems that day; however, because her low back and hip pain was persistent, he opted to address that pain and schedule her for a cervical epidural blockade within a week (*id.*).

Plaintiff returned to Dr. Krueger on October 8, 1998 for initial placement of cervical epidural medications (Tr. 109). Her lumbar pain had subsided somewhat at that time (*id.*). Dr. Krueger performed the cervical epidural injections and instructed Plaintiff to follow up in three weeks (*id.*).

On November 25, 1998, Plaintiff was seen by Dr. Krueger for reevaluation of her continuing low back pain (Tr. 107). She reported that depending upon her activity her pain was a five to a nine on a scale of zero to ten (*id.*). Her pain continued to be in a band-like distribution across her low back with radiation into the left hip and thigh (*id.*). She noticed some slight improvement with physical therapy; however, she continued to have difficulty sleeping (*id.*). Her neck pain had remained tolerable (*id.*). Examination revealed moderate guarding of her low back and extremities, and she had pain on palpation of the left hip (*id.*). She continued to favor her left side with a slightly antalgic gait (*id.*). Her range of motion was limited with flexion to approximately 60 degrees and extension to 20 degrees (*id.*). Lateral rotation was approximately 60 degrees bilaterally, causing increased left low back, buttock, and hip pain (*id.*). Dr. Krueger noted that most of her pain was in the distribution of the T11-12 and L1 dermatomes (*id.*). He opined that because the thoracic disk protrusion was at T11-12, it "certainly may be a significant pain generator to that distribution" (*id.*). Epidural injections had been mildly helpful (*id.*). Dr. Krueger discussed with Plaintiff the use of a single trial placement of neuroforaminal medications at the T11-12 level, which he performed on December 1, 1998 (Tr. 107, 105-06).

Plaintiff underwent an MRI of her cervical spine on February 19, 1999 (Tr. 104). The radiologist noted minimal annular bulging at C3-4, C5-6, and C6-7 with no focal disk protrusion or herniation (*id.*). He also noted a non-enhancing cord lesion at the C4 level and suspected that a demyelinating process was the cause (*id.*).

Plaintiff returned to Dr. Frank on March 3, 1999 (Tr. 103). He noted the C4 lesion and the

concern that she previously had demyelinating disease; however, she had a normal lumbar puncture that did not demonstrate any active disease (*id.*). Therefore, he believed that conservative therapies would continue to be the best approach and planned to see her in four to five months for follow up (*id.*).

Plaintiff was initially evaluated at Roberts Chiropractic Center on April 12, 1999 (Tr. 149-54). She presented with pain and stiffness in her neck and mid to lower back, and she was treated with various chiropractic modalities throughout April and May of 1999 (Tr. 131-48). In May 1999, she was referred to a rheumatologist for possible connective tissue disease (Tr. 131-32).

Plaintiff began treating with Dr. Ashton Graybiel, a rheumatologist, on August 23, 1999 (Tr. 74, 92). She related a history of low back pain after a fall about a year and a half before and complained that the pain had gradually grown to be all over (Tr. 92). She stated that therapy did not help and that she was not able to sleep due to the pain (*id.*). She also reported that she was not working, but had been sewing and watering flowers (*id.*). She complained of low spirits, malaise, and fatigue (*id.*). She had previously taken Relafen and Skelaxin, then started pain medications and Ambien[10] (*id.*). Dr. Graybiel noted that Plaintiff's x-rays and MRI were normal except for a bulging disk (*id.*). His impression was fibromyalgia and depression, and he prescribed Deseryl[11] and Celexa[12] (Tr. 91).

Plaintiff next saw Dr. Graybiel on September 13, 1999 (Tr. 90). Plaintiff reported that she was often sleepy and continued to be in pain (*id.*). However, the medication was helping, and she was less depressed and woke better rested (*id.*). She reported she was exercising on the treadmill fifteen minutes at a time (*id.*). Dr. Graybiel's impression of fibromyalgia and depression was unchanged (*id.*). He increased Plaintiff's Celexa and Deseryl and recommended that she increase her exercise (*id.*).

Plaintiff returned to Dr. Graybiel on October 18, 1999 (Tr. 89). She was doing better, but

---

[10]Ambien is a sedative used to treat insomnia. Ambien Oral, *available at http://www.medscape.com/druginfo/* (Last visited January 12, 2006).

[11]Desyrel is an antidepressant medication. Desyrel Oral, *available at http://www.medscape.com/druginfo/* (Last visited January 12, 2006).

[12]Celexa is an antidepressant medication. Celexa Oral, *available at http://www.medscape.com/druginfo/* (Last visited January 12, 2006).

could only walk twenty to thirty minutes before she experienced lower back pain (*id.*).  She also reported right arm and neck pain (*id.*).  Dr. Graybiel's impression was lower back pain and fibromyalgia (*id.*).  He increased her Deseryl and instructed her to continue exercising (*id.*).

On November 15, 1999, Plaintiff followed up with Dr. Graybiel (Tr. 88).  She was not sleeping well and complained that the soles of her feet and her hands felt hot (*id.*).  Dr. Graybiel's impression was carpal tunnel syndrome, polyarthralgia, and fatigue (*id.*).  He ordered laboratory work, increased Plaintiff's Celexa, and added Klonopin[13] (*id.*).

Plaintiff returned to Dr. Frank on November 17, 1999 with complaints of low back and leg pain (Tr. 102).  She also complained of a sensation of heat and some paresthetic sensations in her hands (*id.*).  A brief examination was benign and did not suggest any radicular problems (*id.*).  Dr. Frank recommended a repeat MRI and noted that he would see her in follow up (*id.*).

Plaintiff was seen by Dr. Graybiel on December 15, 1999 (Tr. 87).  Her energy level was better, and she was walking thirty to forty minutes at a time, but her hips hurt when walking (*id.*).  She also had low back pain on arising in the morning and complained of numbness in her right hand (*id.*).  Dr. Graybiel's impression was polyarthralgia and fibromyalgia, and he recommended relaxation techniques and continued her therapy with no changes (*id.*).

When Plaintiff returned to Dr. Graybiel on January 13, 2000, she was waking more rested than before, but complained of fatigue (Tr. 86).  She also complained of pain at the end of the afternoon in her hips and low back, and she was not exercising (*id.*).  Her spirits were poor, despite the Celexa (*id.*).  Dr. Graybiel's impression was fibromyalgia and depression, and he increased her Celexa and added Vioxx[14] (*id.*).

Plaintiff did not return to Dr. Graybiel until May 5, 2000 (Tr. 85).  Her weight had increased from 164 pounds to 172 pounds (*id.*).  She reported that she had fractured her toe when she fell off a chair hanging wallpaper (*id.*).  She had right shoulder pain, and her knee was sore (*id.*).  Dr.

---

[13]Klonopin is a benzodiazepine used to treat panic disorder.  Klonopin Oral, *available at http://www.medscape.com/druginfo/* (Last visited January 12, 2006).

[14]Vioxx is a non-steroidal anti-inflammatory medication that was removed from the market in 2004.  Vioxx Pulled from Global Market, *available at http://www.medscape.com/druginfo/* (Last visited January 12, 2006).

Graybiel discontinued her Vioxx, continued her other medications, and added Naprosyn[15] and Darvocet[16] (*id.*).

Plaintiff was seen by Dr. Graybiel on June 2, 2000 (Tr. 84).  Her weight had increased from 172 pounds to 174 pounds (*id.*).  She had not been active due to her injuries (*id.*).  Dr. Graybiel stopped the Klonopin and decreased the Deseryl (*id.*).  However, on June 27, 2000, Plaintiff called Dr. Graybiel and requested to resume the Klonopin and increase the Deseryl because she could not sleep (*id.*).

When Plaintiff returned to Dr. Graybiel on July 7, 2000, her weight had increased to 177 pounds (Tr. 83).  Her knee pain was worse, but she was able to walk on the treadmill for twenty minutes (*id.*).  Plaintiff's shoulder was painful as well (*id.*).  She was sleeping better on the Deseryl and Klonopin, but was twitching at night (*id.*). Dr. Graybiel recommended a diet and exercise program (*id.*).

On July 30, 2000, Plaintiff had cervical spine, left knee, and right femur x-rays, all of which were normal (Tr. 82).

Plaintiff returned to Dr. Graybiel on September 11, 2000 (Tr. 80).  She had fallen on July 31, 2000 while walking down the hall in the hospital (*id.*).  She complained that she was aching all over and not sleeping (Tr. 79).  Dr. Graybiel's impression was fibromyalgia and lower back pain, and he increased Plaintiff's Deseryl (*id.*).

When Plaintiff returned to Dr. Graybiel on October 9, 2000, she stated that she wanted to "get off antidepressants" (*id.*).  She was sleeping better and was somewhat less achy, but her knee hurt when she stooped (*id.*).  She was walking for thirty minutes and using a sport rider for twenty minutes (*id.*).  Dr. Graybiel's impression was fibromyalgia and degenerative disk disease at L4-5, and he decreased Plaintiff's Celexa and Deseryl (*id.*).

Plaintiff was next seen by Dr. Graybiel on November 13, 2000 (Tr. 78).  Her weight had decreased from 181 pounds to 178 pounds, and she was doing well on the decreased dosages of Celexa and Deseryl (*id.*).  She was exercising, but hurting more in her low back and above her waist

---

[15]Naprosyn is a non-steroidal inti-inflammatory medication.  Naprosyn Oral, *available at http://www.medscape. com/druginfo/* (Last visited January 12, 2006).

[16]Darvocet is a narcotic analgesic.  Darvocet Oral, *available at http://www.medscape.com/druginfo/*  (Last visited January 12, 2006).

line (*id.*).  She was also experiencing right thigh pain and was hurting more all over (*id.*).  Dr. Graybiel's impression was fibromyalgia with worsening symptoms (*id.*).  Dr. Graybiel decreased her Celexa and Deseryl further and added Ultram[17] (*id.*).

Plaintiff followed up with Dr. Frank on December 12, 2000 (Tr. 99).  Dr. Frank had last seen her in November 1999, at which time an MRI of the cervical spine and brain were taken for lesions that seemed to him most consistent with ischemic demyelination (Tr. 99).  Those studies were compared with earlier MRI films and were stable (*id.*).  Plaintiff complained of low back pain, which Dr. Frank stated was not related to the cervical spine and brain lesions (*id.*).  Dr. Frank noted that he was not seeing her for her low back discomfort or other discomfort (*id.*).  He planned to do follow up MRIs and see Plaintiff again in two years if the studies were stable (*id.*).  On December 28, 2000, it was noted in Plaintiff's chart that her MRI results were stable with no new lesions (Tr. 98).

Plaintiff called Dr. Graybiel's office on December 13, 2000 with complaints of lower back and head pain and stated that she had taken Darvon[18] without relief (Tr. 77).  Dr. Graybiel prescribed Lortab[19] (*id.*).

From January 2001 through February 2002, Plaintiff was seen by Dr. Graybiel only once, but she called into his office and received refills on her prescription medications on multiple occasions (Tr. 75-76, 225).  When she was seen by Dr. Graybiel on July 6, 2001, Plaintiff was taking Deseryl, Ultram, and Celexa (Tr. 227).  She also had been taking her husband's Lortab (*id.*).  Plaintiff had been exercising little because she did not feel like it and complained of feeling achy all over, worse in her neck, right shoulder, and low back (*id.*).  Dr. Graybiel's impression was degenerative disk disease and fibromyalgia (Tr. 226).  He planned to continue her medications and noted that she needed to exercise (*id.*).  He did not feel that she was making an effort to help herself and noted that she was self-medicating (*id.*).  It was Dr. Graybiel's opinion that many of Plaintiff's problems were due to her lack of effort to help herself (*id.*).

---

[17]Ultram is a non-narcotic analgesic.  Ultram Oral, *available at http://www.medscape.com/druginfo/* (Last visited January 12, 2006).

[18]Darvon is a narcotic analgesic.  Darvon Oral, *available at http://www.medscape.com/druginfo/* (Last visited January 12, 2006).

[19]Lortab is a narcotic analgesic.  Lortab Oral, *available at http://www.medscape.com/druginfo/* (Last visited January 12, 2006).

On April 22, 2002, Plaintiff presented to John G. Brown, M.D. (Tr. 213). She complained of severe worsening of fibromyalgia (*id.*). Multiple trigger points were noted, and her range of motion was restricted (*id.*). Plaintiff's affect and mood were flat (*id.*). She had extreme spasms in the trapezius area and upper shoulder, with multiple trigger points both anteriorly and posteriorly (*id.*). However, she had a sunburn, which was painful and made examination and diagnosis somewhat difficult (*id.*). Dr. Brown's assessment was fibromyalgia, menopause syndrome, obesity, depression, and insomnia (*id.*). He ordered blood work, including thyroid tests, provided weight reduction information, instructed Plaintiff to do a muscle strengthening program, planned to taper the Celexa and increase the Deseryl, and instructed her to use Klonopin at night as needed for sleep (*id.*).

Plaintiff returned to Dr. Brown on May 16, 2002 (Tr. 212). She had been tapering the Celexa, but was feeling much worse (*id.*). Her husband noted that her depression had dramatically worsened since going off Celexa (*id.*). Plaintiff appeared to be in acute distress and was unable to move except slowly "with assistance from splinting on cabinets and doorways" (*id.*). More than seventeen trigger points were noted and her trochanteric area was exquisitely tender (*id.*). Dr. Brown's plan included starting Wellbutrin,[20] as well as follow up visits with Plaintiff on at least a monthly basis (*id.*).

Plaintiff followed up with Dr. Brown on June 14, 2002, and her medications were continued (Tr. 211). She returned on September 13, 2002, and multiple trigger points were again noted (Tr. 210). Plaintiff next saw Dr. Brown on December 10, 2002 with complaints of aches and pains (Tr. 208). Multiple trigger points were noted, including in the anterior and posterior chest areas, trochanteric area, and upper back and neck areas (*id.*). Plaintiff related an almost complete inability to perform activities of daily living (*id.*). Her affect and mood were extremely flat, and she admitted to severe depression (*id.*). Dr. Brown adjusted her Wellbutrin and continued her other medications (*id.*).

On December 30, 2002, Dr. Brown completed a form entitled "Clinical Assessment of Pain" (Tr. 221-22). According to Dr. Brown, pain was present to such an extent as to be distracting to adequate performance of daily work or activities (Tr. 221). Additionally, physical activity would

---

[20]Wellbutrin is an antidepressant. <u>Wellbutrin Oral</u>, *available at http://www.medscape.com/druginfo/* (Last visited January 12, 2006).

cause an increase in pain to such a degree as to cause distraction from tasks or total abandonment of tasks (*id.*).  Pain medications and side effects would be expected to seriously limit Plaintiff's effectiveness, and treatments for pain, such as biofeedback or nerve stimulation injections, had no appreciable effect or only briefly altered Plaintiff's level of pain (Tr. 222).

Dr. Brown also completed a Physical Capacities Evaluation (Tr. 223).  According to Dr. Brown, Plaintiff was able to sit, stand, and walk for an hour at a time.  Plaintiff could sit a total of six hours in an eight-hour workday and stand or walk a total of two hours (*id.*).  He opined that Plaintiff could work only a total of one hour per day (*id.*).  Plaintiff could occasionally lift up to twenty pounds and carry up to ten pounds (*id.*).  Plaintiff could not use her hands for repetitive actions such as grasping, pushing and pulling of arm controls, or fine manipulation (*id.*).  Plaintiff was occasionally able to bend, but never able to squat, crawl, climb, or reach (*id.*).  She was totally restricted from unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, and exposure to dust, fumes, and gases (*id.*).  She was moderately restricted from driving automotive equipment (*id.*).  Dr. Brown documented that these physical limitations have existed since on or about May 2, 1998 (*id.*).  Finally, Dr. Brown stated that based on his observation and treatment of Plaintiff, she could be expected to miss in excess of 25 to 30 days of work per year as a result of her medical conditions (Tr. 224).  Additionally, he stated that he believed Plaintiff would experience chronic symptoms from her medical conditions that could reasonably be expected to cause distraction from job tasks or result in a failure to complete job tasks in a timely manner (*id.*).

C.      Other Information Within Plaintiff's Claim File

A psychological evaluation was completed by Lynn E. Lightfoot, Ph.D., on January 2, 2001 (Tr. 155).  Plaintiff presented with complaints of low back pain and fibromyalgia (*id.*).  She reported pain in her neck, shoulders, hips, knees, and legs, which was constant and could spread throughout her body (*id.*).  She reported that she experienced an increase in pain with almost any activity, but lying flat was sometimes relieving (*id.*).  She made no primary complaint of  a mental disorder, but stated that she "broke down" in Dr. Graybiel's office and that he told her she was decompensating after the stress of her pain and resulting inactivity (*id.*).  She reported that it was "depressing" to be so limited and unable to enjoy her grandchildren and her yard like she used to (*id.*).

Plaintiff appeared for the evaluation casually dressed and adequately groomed (Tr. 156).  She

moved with care, as if in some discomfort (*id.*).  She reported that her husband accused her of forgetting things they had discussed, but she thought it was due to a preoccupation with other thoughts and lack of attention (*id.*).  She acknowledged that pain often distracted her thinking (*id.*).  Her primary complaint was that pain interfered with most of her activities, and she reported that she reacted to the pain by withdrawing (*id.*).  She also reported that her mood was flattened and she became nervous when away from home (*id.*).

According to Dr. Lightfoot, Plaintiff presented with pain and multiple symptoms of fibromyalgia (Tr. 157).  Dr. Lightfoot documented that consequent to Plaintiff's diagnosis of fibromyalgia was an abrupt change in her activity, income, and sense of satisfaction (*id.*).  Plaintiff exhibited signs of depression and anxiety and would benefit from some counseling to help her adjust to her new lifestyle (*id.*).  Dr. Lightfoot documented that Plaintiff's score on the Global Assessment of Functioning ("GAF") scale was 60 (*id.*).[21]  Her diagnosis was mood disorder due to fibromyalgia with mixed features, and her prognosis was guarded (*id.*).

On January 5, 2001, Arineta Speer, M.D., completed a disability medical evaluation (Tr. 158-63).  Dr. Speer noted that Plaintiff walked into the office without assistance and without a limp (Tr. 158).  Her chief complaint was her "back, not being able to work, and Judge DeMarco told [her] to try for [her] disability" (*id.*).  Dr. Speer also noted that Plaintiff was being treated for depression, "which started sometime after her persistent pain" (*id.*).  On examination, no spasm was noted in her back and straight leg raises were negative to 60 degrees bilaterally (Tr. 160).   Plaintiff's thoracolumbar spine was limited in flexion, extension, and rotation, and she had tenderness in her left hip and right shoulder (Tr. 162).

Dr. Speer's diagnosis was chronic neck and back pain, fibromyalgia, and depression (Tr. 160).  According to Dr. Speer, Plaintiff had physical limitations relating to her fibromyalgia, neck pain, and back pain that affected her ability to function fully (Tr. 161).  Plaintiff would not be able to sustain prolonged running, walking, climbing, crawling, squatting, bending, or lifting due to her

---

[21]Global assessment of functioning is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance.  Global Assessment of Functioning, *available at http://www.behavenet.com/capsules/disorders/GAF.htm* (Last visited November 22, 2005).  It may be expressed as a numerical score.  *Id.*  A score of 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning  (e.g., few friends, conflicts with peers or co-workers).  Global Assessment of Functioning, *available at http://dpa.state.ky.us/library/manuals/mental/Ch22.html* (Last visited November 22, 2005).

Case No.: 3:04cv316/MCR/EMT

back (*id.*).  She could handle light[22] objects with her hands and perform simple hand manipulations (*id.*).  However, her depression and psychological state affected her ability to function both mentally and physically, and she needed proper psychiatric treatment (*id.*).

A Psychiatric Review Technique ("PRT") was completed by John W. Scott, Ph.D., on January 23, 2001 (Tr. 172-85).  According to Dr. Scott, Plaintiff had an affective disorder; however, it was not severe (Tr. 172).  On the PRT form, Dr. Scott marked that Plaintiff had depressive syndrome, but did not mark the symptoms it was characterized by (Tr. 175).  Dr. Scott also marked that Plaintiff had a medically determinable impairment that did not satisfy the diagnostic criteria listed on the form and wrote that she had a mood disorder due to fibromyalgia and pain (*id.*).  Dr. Scott documented that Plaintiff was mildly limited in activities of daily living, and had mild difficulty in maintaining social functioning, concentration, persistence, or pace (Tr. 182).

I.B. Price, M.D., completed a Physical Functional Residual Capacity Assessment on January 31, 2001 (Tr. 164-71).  According to Dr. Price, Plaintiff had the capacity to lift twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for about six hours in an eight-hour workday; and had the unlimited ability to push or pull (Tr. 165).  Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, and had no manipulative, visual, communicative, or environmental limitations (Tr. 166-68).  Dr. Price noted that Plaintiff had a history of fibromyalgia and back, neck, and right knee pain with decreased range of motion; however, he documented that she had no herniated disk (Tr. 165, 169).

Robert L. Steele, M.D., completed a Physical Functional Residual Capacity Assessment on June 21, 2001 (Tr. 186-93).  According to Dr. Steele, Plaintiff had the capacity to lift twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for about six hours in an eight-hour workday; and was unlimited in her ability to push or pull (Tr. 187).  Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, and had no manipulative, visual, communicative, or environmental limitations (Tr. 188-90).  Dr. Steele noted that Plaintiff alleged disability secondary to neck and back pain, but imaging studies revealed moderate degenerative changes with no nerve root impingement (Tr. 191).  Plaintiff's examination was positive only for slightly decreased range of motion; therefore, Dr. Steele opined that her residual functional capacity was

---

[22]Dr. Speer did not define "light" or "prolonged."

reduced to light (*id.*).

A second Psychiatric Review Technique was completed on June 29, 2001 by an agency physician (name illegible) (Tr. 194-207). Plaintiff was found to have a mood disorder secondary to chronic pain, but her impairment was found to be non-severe (Tr. 194, 197). She was also found to have mild difficulty in maintaining concentration, persistence, or pace, but no other functional limitations (Tr. 204).

V.     DISCUSSION

Plaintiff raises four issues on appeal (Doc. 9). Plaintiff first contends that the ALJ erred in finding her mental impairment non-severe at step two of the sequential evaluation and in failing to consider this impairment in determining her RFC (*id.* at 2-5). Second, Plaintiff contends that the ALJ improperly rejected her treating physician's opinions and gave great weight to the opinions of a non-examining state agency physician (*id.* at 2, 5-14). Third, Plaintiff asserts that the ALJ improperly discounted her subjective complaints (*id.* at 3, 14-17). Fourth, Plaintiff asserts that the ALJ failed to fully develop the record (*id.* at 2, 14, 17-18).

A.  Severity of Mental Impairment at Step Two

At step two of the evaluation sequence, the ALJ found that Plaintiff had several physical impairments that were "severe" within the meaning of the Regulations (Tr. 15). However, the ALJ concluded that Plaintiff's mental impairment (i.e., her depression) was non-severe (Tr. 12-13). Plaintiff contends that the ALJ erred in reaching this conclusion because he relied on the opinions of non-examining physicians, misstated the test under step two of the sequential evaluation, and failed to consider this impairment or associated symptoms beyond step two as required (Doc. 9 at 2-5). Defendant contends that the ALJ properly determined that Plaintiff's mental impairment was non-severe (Doc. 12 at 3-6).

The ALJ must determine at step two whether the claimant has a severe impairment. An impairment is severe if it significantly limits an individual's physical or mental ability to do basic work activities. 20 C.F.R. § 1520(c). The burden at this step is on the claimant. Chester, 792 F.2d at 131. The Commissioner's regulations provide:

> What we mean by an impairment(s) that is not severe.
> (a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include-- (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521.  The Commissioner has adopted an interpretive ruling that specifically addresses how to determine whether impairments are severe.  The ruling provides in part:

As explained in 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), and 416.921, at the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any SGA [substantial gainful activity].  An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a *slight abnormality* or a combination of slight abnormalities which would have *no more than a minimal effect* on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). Thus, even if an individual were of advanced age, had minimal education, and a limited work experience, an impairment found to be not severe would not prevent him or her from engaging in SGA.

SSR 85-28, 1985 WL 56856 (emphasis added).

In Brady v. Heckler, 724 F.2d. 914, 920 (11th Cir. 1984) the Eleventh Circuit used the same test adopted in SSR 85-28 to hold that "[a]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  The Eleventh Circuit has further interpreted the regulations to mean that "only claims based on the *most trivial impairments* [can] be rejected" at step two, noting that step two is a "threshold inquiry" and that a claimant's "burden at step two is mild." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (emphasis added).  Although the ALJ considered Plaintiff's depression at step two, he erred in finding that it was non-severe.

Additionally, the evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in eight diagnostic categories.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The

criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work (i.e., limitations in functional areas deemed essential to work).

The severity of a mental disorder is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders, or in this case, paragraph B of Listing 12.04 (Affective Disorders), which lists the following four criteria: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration.  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ noted that Plaintiff had received treatment for depression from Dr. Brown, that her medications included several antidepressants, and that in December 2002, Plaintiff described herself as being "severely depressed" and Dr. Brown noted that her affect and mood were "extremely flat" (Tr. 12-13).  However, in finding Plaintiff's depression non-severe, the ALJ noted that Dr. Brown's specific functional limitations included physical limitations only, his notes document treatment for depression for only an eight-month period, and his notes show no referral to any specialized mental health treatment (Tr. 13).  Further, the ALJ stated that during a consultative examination in January 2001, Plaintiff made no primary complaint of a mental disorder, nor did she provide a history of any mental health therapy (Tr. 12).  Thus, the ALJ determined that Plaintiff failed to establish that her depression would impose "significant, work-related mental limitations for a continuous period of at least 12 months" (Tr. 13).  The ALJ also stated that a review of the medical evidence failed "to establish that, for the requisite 'duration' period, [Plaintiff] has had mental impairment(s) imposing more than mild restriction of activities of daily living, or ability to maintain social functioning, or ability to sustain concentration, persistence, or pace" (id.).  Finally, the ALJ noted that the evidence failed to show any extended episodes of mental decompensation, a consultative examiner suggested no more than moderate symptoms, and reviewing state agency specialists determined that Plaintiff's mental condition was not severe (id.).  Therefore, the ALJ concluded that a "severe" mental

impairment had not been established (*id.*).

Upon a careful review of the record, this court finds that the conclusion reached by the ALJ is not supported by substantial evidence in the record. Two of Plaintiff's treating physicians, Dr. Brown and Dr. Graybiel, diagnosed her with depression and treated her with multiple antidepressant medications. Although the ALJ stated that Plaintiff was treated for depression by Dr. Brown for only eight months,[23] and therefore her impairment did not meet the duration requirement of at least twelve months (*id.*), other evidence establishes that Plaintiff indeed met the requisite duration period. Plaintiff was initially diagnosed with depression and prescribed antidepressants by Dr. Graybiel on August 23, 1999 (Tr. 91), and he continued to treat her with antidepressants through February 2002 (Tr. 75-92, 225-27). She was also diagnosed with a mood disorder by Dr. Lightfoot on January 2, 2001 (Tr. 157), and with depression by Dr. Speer on January 5, 2001 (Tr. 160).

Moreover, Dr. Lightfoot, an examining psychological consultant, opined that Plaintiff exhibited signs of depression and anxiety and would benefit from counseling (Tr. 157). Although Plaintiff made no "primary complaint of [a] mental disorder" to Dr. Lightfoot, as noted by the ALJ, she did report a breakdown, decompensation, and depression resulting from the stress of her pain and resulting inactivity (Tr. 155). Dr. Lightfoot documented that Plaintiff's Global Assessment of Functioning score was 60, in other words, Plaintiff had *moderate* limitations in social, occupational, and/or academic functioning (Tr. 157). She was diagnosed with a mood disorder, and Dr. Lightfoot noted that Plaintiff's prognosis was "guarded" (*id.*). A second examining physician, Dr. Speer, documented that Plaintiff's depression and psychological state affected her ability to function both mentally and physically and that she was in need of proper psychiatric treatment (Tr. 161). This evidence weighs in favor of a finding of a severe impairment because it shows that Plaintiff's depression would likely have had *more than a minimal effect* on her ability to work, and it is not the sort of *trivial impairment* that should be rejected at step two. The only evidence to the contrary is the opinion of two non-examining sources that Plaintiff had at most *mild* limitations in activities of daily living and maintaining social functioning, and in maintaining concentration, persistence, or pace (Tr. 182, 204). However, this does not constitute substantial evidence that Plaintiff's mental

---

[23] Dr. Brown diagnosed Plaintiff with depression at her initial visit with him in April 2002, and he documented her depression until his records end in December 2002 (Tr. 208-24).

impairment was non-severe.  These opinions are inconsistent with the record as a whole, and they were rendered by non-examining physicians whose opinions are entitled to little weight.  Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985).  Accordingly, the case should be remanded with directions that the ALJ properly evaluate Plaintiff's mental impairment at step two and continue the evaluation sequence accordingly.

B.  Treating Physician's Opinion and Non-examining Physician's Opinion

Plaintiff contends the ALJ erred in rejecting the opinions of her treating physician, Dr. Brown, and in giving great weight to the opinions of a non-examining state agency physician (Doc. 9 at 2, 10-14).  Defendant contends that the ALJ assigned the proper amount of weight to the medical source opinions of record (Doc. 12 at 11-14).

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  See Lewis v. Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Commissioner of Social Security,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Edwards, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); see also Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination, 2) the nature and extent of the treatment relationship, 3) medical evidence supporting the opinion, 4) consistency with the record a whole, 5) specialization in the medical issues at issue, and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's

opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734

F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a

medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making

the ultimate determination about whether a claimant meets the statutory definition of disability.  20

C.F.R. § 404.1527(e).   The ALJ is not required to give any special significance to the status of a

physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed

impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546),

or the application of vocational factors because those ultimate determinations are the providence of

the Commissioner.  20 C.F.R. § 404.1527(e).

In the instant case, the ALJ discounted the opinion of Plaintiff's treating physician, Dr.

Brown, which limited Plaintiff's physical abilities[24] to lift/carry, sit/stand, walk, and perform

postural activities and manipulation, as well as Dr. Brown's opinion that such restrictions had been

present since May 1998 (Tr. 16).  In rejecting Dr. Brown's opinion, the ALJ noted that Dr. Brown

did not treat Plaintiff until April 2002 (*id.*).  The ALJ concluded, therefore, that Dr. Brown's

functional limitations dating back to May 1998 were not supported by "appropriate clinical evidence

and cannot merit controlling weight based on the overall evidence of record" (*id.*).  Initially, the

court notes that there is some conflict in the record regarding the length of Plaintiff's treatment with

Dr. Brown.  Although Dr. Brown's records in the transcript do not begin until April 2002 (Tr. 213),

there is an indication that Plaintiff may have been his patient at an earlier time.  A letter from Dr.

Frank, who saw Plaintiff in July 1998, indicates that he previously saw Plaintiff in 1995 after "she

was referred by Dr. John Brown" (Tr. 129).  Nevertheless, even if Plaintiff did not see Dr. Brown

until April 2002, a treating physician's opinion is still entitled to significant weight, even when the

physician did not treat the claimant until after the relevant determination date.  Boyd v. Heckler, 704

F.2d 1207, 1211 (11th Cir. 1983) (finding that opinion of physician regarding claimant's limitations

from the time of her injury in August 1972 until May 1980 was entitled to significant weight, even

---

[24]In addition to providing an opinion regarding Plaintiff's physical abilities, Dr. Brown opined that Plaintiff's
pain was present to such an extent to be distracting to adequate performance of daily work and that pain medications and
side effects would limit Plaintiff's effectiveness (Tr. 221-22).  He also stated that Plaintiff would be expected to miss in
excess of 25 to 30 days of work per year as a result of her medical conditions (Tr. 224).  However, the ALJ apparently
failed to consider these opinions, as they are mentioned nowhere in his opinion.

though physician first saw claimant in 1977), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir.1991).  Thus, it was improper for the ALJ to discount Dr. Brown's opinion based on the fact that he initially treated Plaintiff four years after her alleged onset date.

Additionally, the ALJ stated as follows, "[i]nsofar as Dr. Brown gave a 'current' assessment of functioning, the [ALJ] notes that [Dr. Brown] initially noted that Ms. Tatum presented with a history of fibromyalgia, *apparently diagnosed by Dr. Graybiel*" (Tr. 16) (emphasis added).  The ALJ suggests that Dr. Graybiel's fibromyalgia diagnosis is suspect because Dr. Graybiel "entered *impressions* of fibromyalgia" in his records, instead of entering a diagnosis of fibromyalgia (Tr. 16) (emphasis in original).  However, because some physicians use the terms "impression" and "diagnosis" interchangeably, this was not a valid reason for the ALJ to question whether Plaintiff was actually diagnosed with fibromyalgia by Dr. Graybiel, nor was it improper for Dr. Brown to note and rely upon the fact that Plaintiff presented to his office "with a history of fibromyalgia" based upon Dr. Graybiel's records.  *See* Is One Doctor's Impression Another Doctors Diagnosis?, *available at http://www.healthcentral.com/drdean/408/12719.html* (Last visited December 2, 2005).

In addition to questioning whether Dr. Graybiel actually diagnosed Plaintiff with fibromyalgia, the ALJ also questioned whether the records of Dr. Brown and Dr. Graybiel together "fully establish" a fibromyalgia diagnosis because "no descriptions of specific tender points in the requisite quantity and location, or other efforts at [a] differential diagnosis [of fibromyalgia], appear in [their] records" (Tr. 16).

The diagnosis of fibromyalgia is based largely on the patient's subjective complaints, and positive laboratory findings are simply unavailable.  The disease has been recognized by The American College of Rheumatology as both real and difficult to confirm:

> Fibromyalgia is especially confusing and often misunderstood because almost all its symptoms are also common in other conditions. . . .  Unfortunately, because certain symptoms lack physical and laboratory findings (signs), but depend mostly on a person's report of complaints and feelings (symptoms), these syndromes are often viewed as not being real or important.

Arthritis Foundation & American College of Rheumatology, Arthritis Information: Fibromyalgia (1992).

The American College of Rheumatology has developed diagnostic criteria by which a person can be affirmatively diagnosed with the condition if he or she has widespread pain in combination

with tenderness in at least 11 of 18 specific tender point sites.  *See* National Institute of Arthritis and Musculoskeletal and Skin Diseases, Questions and Answers About Fibromyalgia (1999), *available at http://www.niams.nih.gov/hi/topics/fibromyalgia/fibrofs.htm.*  The Seventh Circuit has held that requiring positive laboratory findings is error in cases of this nature.  Sarchet v. Chater, 78 F.3d 305 (7th Cir. 1996) (ALJ erred in finding claimant non-disabled because of lack of positive laboratory tests) (cited approvingly in Stewart v. Apfel, 245 F.3d 793 (11th Cir. 2001) (table), 2000 U.S. App. LEXIS 33214 (unpublished opinion)[25]).  In Stewart, the Court reviewed medical research on fibromyalgia, noting that it often lacks medical or laboratory signs, is generally diagnosed mostly on an individual's described symptoms, and its hallmark is a lack of objective evidence.  Thus, the ALJ's determination that a fibromyalgia claimant's testimony was incredible, based on the lack of objective evidence documenting the impairment, was reversed.  Stewart, 245 F.3d at 793, 2000 U.S.App. LEXIS 33214, at *9, n. 4.  More recently, the Eleventh Circuit addressed fibromyalgia in the case of Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  The Court reiterated the impropriety of focusing on the absence of objective findings corroborating claims of the impairment.

Other Circuits that have considered the issue have found that fibromyalgia is a disease that can serve as the basis for a medically determinable impairment, even without positive laboratory findings.  *See, e.g.*, Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues, can be disabling."); Preston v. Secretary of Health & Human Services, 854 F.2d 815, 817-18 (6th Cir. 1988) ("Fibrositis [now fibromyalgia] causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances," and diagnosis involves testing for focal tender points.).  Indeed, the Commissioner has recently instructed that in cases of chronic fatigue syndrome, a condition that, like fibromyalgia, is based largely on self-reported symptoms, "[p]ersistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points" is an example of a medical sign that establishes the existence of a medically determinable impairment.  Social Security Ruling 99-2p, 1999 WL 271569 (1999).

Contrary to the ALJ's suggestion, the record in this case clearly establishes a fibromyalgia diagnosis.  Further, the ALJ's statement that the records of Dr. Brown and Dr. Graybiel do not "fully

---

[25]Unpublished decisions of this court are not binding precedent.  *See* 11th Cir. R. 36–2.

establish" a fibromyalgia diagnosis because "no descriptions of specific tender points in the requisite quantity and location, or other efforts at [a] differential diagnosis [of fibromyalgia], appear in [their] records"(Tr. 16) is not supported by substantial evidence in the record.  Although Dr. Brown did not document the specific location of each trigger point, he documented "multiple" trigger points at Plaintiff's initial visit and on at least two other occasions (*see* Tr. 208, 210, 213).  He more specifically documented that Plaintiff had "more than seventeen trigger points"on May 16, 2002 (Tr. 212) and that multiple trigger points were noted on December 12, 2002, including trigger points in the anterior and posterior chest areas, trochanteric area, and upper back and neck areas (Tr. 208). In addition to the trigger points, Dr. Brown documented other complaints characteristic of the syndrome, including pain, disturbed sleep, and fatigue (Tr. 208-13).  Moreover, it appears that Dr. Brown did consider differential diagnoses at Plaintiff's initial visit, as he ordered a check of Plaintiff's thyroid-stimulating hormone level (Tr. 213).   Such testing is done to rule out hypothyroidism, which can mimic the symptoms of fibromyalgia. *See* Millea & Holloway, Treating Fibromyalgia, Paul J. Millea, M.D., M.S., and Richard L. Holloway, Ph.D., 62 American Family Physician 1157 (2000), *available at http://www.aafp.org/afp/20001001/1575.html*.   Finally, documentation of Plaintiff's fibromyalgia appears throughout Dr. Brown's records (*see, e.g.*, Tr. 208, 210, 212, 213).  Thus, the record indeed establishes a fibromyalgia diagnosis, based not only upon Dr. Brown's records, but also upon those of Dr. Graybiel (Tr. 79), Dr. Lightfoot (Tr. 157), Dr. Speer (Tr. 160), Dr. Scott (Tr. 175), and Dr. Price (Tr. 165).

Although the ALJ seriously questioned the existence of a fibromyalgia diagnosis, he ultimately found it to be a severe, but non-disabling, impairment (Tr. 15-16), and stated as follows: "Even if the [fibromyalgia] diagnosis were fully established, Dr. Graybiel, who reportedly entered it, has not described such impairment as disabling the claimant from all work.  Rather, it appears the physician encouraged the claimant to exercise and walk more, as did another treating physician, Dr. Krueger." (Tr. 16).  As to Dr. Graybiel's failure to describe Plaintiff as disabled, it does not appear that he was ever asked to render such an opinion.  Additionally, encouraging Plaintiff to exercise or walk is not necessarily inconsistent with Dr. Brown's limitations.  Dr. Brown opined that Plaintiff could  stand or walk each for an hour at a time, for a total of two hours per day (Tr. 223).  Plaintiff's medical records document that Plaintiff exercised on the treadmill generally in fifteen to no more than forty-minute intervals (*see, e.g.*, Tr. 79, 83, 87, 89-90).  Thus, the doctors' encouragement to

exercise is not inconsistent with Dr. Brown's limitations because there is no evidence suggesting that they encouraged Plaintiff to walk for more than an hour at a time or more than two hours in a day. Indeed, it appears she was advised to exercise in short intervals (*see id.*). Moreover, it should also be noted that the ALJ's opinion fails to consider, nor even mention, the restrictive limitations set by Dr. Brown resulting from Plaintiff's pain and medical condition (*see* footnote 24, *supra*).

In further discrediting Dr. Brown's opinions, the ALJ noted that "The consultative examiner and State Agency medical consultant each opined that Ms. Tatum remained capable of engaging in at least light exertion." (Tr. 16). It appears that the ALJ is referring to the opinions of Dr. Steele and Dr. Speer. The ALJ was correct in noting Dr. Steele's belief that Plaintiff was capable of light exertion, as Dr. Steele indicated that Plaintiff's "RFC is reduced to light" (Tr. 191). However, Dr. Steele also found that Plaintiff's symptoms were "partially credible," but did not indicate which symptoms were incredible and how this might have affected his ultimate determination (*id.*). Moreover, as the court is well aware, the opinion of a non-examining physician is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good cause for disregarding the opinion of the treating physician. Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985). As to Dr. Speer, however, this court concludes that her opinion was not as specific as that noted by the ALJ. Dr. Speer noted that Plaintiff had physical limitations affecting her ability to function fully, and that she could not sustain "prolonged" running, walking, or other activities, but she could handle "light" objects (Tr. 161). However, Dr. Speer did not define the terms "prolonged" or "light" (*id.*). Additionally, she noted that Plaintiff's depression and psychological state affected her ability to function both mentally and physically (*id.*). Dr. Speer did not describe Plaintiff's limitations with any further specificity, and thus it is unclear whether Dr. Speer actually found that Plaintiff was capable of "engaging in at least light exertion." Even if Dr. Speer made such a finding, she is a non-examining physician and her opinion is entitled to little weight.

Finally, while opinions expressed by treating physicians are generally due substantial weight, that deference is heightened when a treating physician makes a disability determination based on the condition of fibromyalgia. *See* Morrison v. Barnhart, 278 F. Supp. 2d 1331, 1335 (M.D. Fla. 2003) ("a treating physician's determination that a patient is disabled due to fibromyalgia is even more valuable because there are no objective signs of severity and the physician must interpret the data for the reader") (citing Stewart, 245 F.3d at 793).

For the foregoing reasons, this court concludes that the ALJ improperly discounted the opinion of Dr. Brown, Plaintiff's treating physician.  As stated in MacGregor, 786 F.2d at 1053, "Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true."  Therefore, upon remand, the ALJ must now accept as true the conclusions and opinions of Dr. Brown and evaluate Plaintiff's claim accordingly.

C.  The 11th Circuit Pain Standard and Evaluation of Plaintiff's Credibility

Plaintiff contends that the ALJ improperly discounted her subjective complaints (Doc. 9 at 3, 14-17), while Defendant asserts that the ALJ properly evaluated her credibility (Doc. 12 at 7-11).

As this court is well aware, pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  Accord 20 C.F.R. § 416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard."  Wilson, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence."  Marbury v. Sullivan, 957

F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)). However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered. *Id.*; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the Plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . . Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." MacGregor v. Bowen, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223. "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court. The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted). The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. Sept. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[26] People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." Hand, *supra,* at 1548-49. It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence." Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984). Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by

---

[26]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

Here, in finding Plaintiff's subjective complaints not fully credible, the ALJ noted that Plaintiff acknowledged a continuing ability to prepare simple meals, perform housework at a reduced pace, drive short distances, hang wallpaper,[27] walk on a treadmill, and use a sport rider device (Tr. 16-17).  The ALJ also noted that Dr. Graybiel questioned Plaintiff's effort and compliance with prescribed treatment, and noted that Plaintiff's pursuit of a worker's compensation claim introduced an issue with respect to potential secondary gain (Tr. 17).

Upon review of the entire record, this court finds that the ALJ's reasons for discrediting Plaintiff's subjective complaints are not supported by substantial evidence.  Plaintiff was diagnosed with two medical conditions, degenerative disk disease and fibromyalgia, which could reasonably be expected to produce significant pain.  In fact, one of Plaintiff's treating physicians, Dr. Krueger, documented that much of Plaintiff's back, buttock, and hip pain was in the distribution of the T11-12 and L1 dermatomes, and because the thoracic disk protrusion was at T11-12, it "certainly may be a significant pain generator to that distribution" (Tr. 107).  Another of Plaintiff's treating physicians, Dr. Brown, opined that her pain was severe enough to significantly interfere with her ability to perform work (Tr. 224).  Additionally, Dr. Lightfoot diagnosed Plaintiff with a mood disorder due to her fibromyalgia (Tr. 157), which, as discussed *supra*, is a disease characterized by widespread pain (*see* Kelley, 133 F.3d at 589 (fibromyalgia is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues); Preston, 854 F.2d at 817-18 (fibromyalgia causes severe musculoskeletal pain)).  Even the two non-examining state agency consultants opined that Plaintiff's chronic pain was the cause of her mood disorder (Tr. 175, 197).  Plaintiff tried various modalities to treat her pain, such as physical therapy, chiropractic treatment, and medications.  She also underwent multiple spinal injections, which are invasive procedures (*see* Tr. 109, 122) that a physician would not perform without clear indication.

Nothing in the record suggests that Plaintiff was dishonest in her testimony or in her reports to her physicians.  While Dr. Graybiel became frustrated with Plaintiff and documented that he felt some of Plaintiff's problems were due to a lack of effort to help herself, this does not indicate that

---

[27]It appears from the medical records that Plaintiff attempted to hang wallpaper on one occasion, but fell off a chair doing so (Tr. 85).

Plaintiff was untruthful with him. In fact, it appears Plaintiff was quite forthcoming, admitting at that visit that she had not been exercising much and that she had taken narcotic medication that was not prescribed for her (Tr. 226). The ALJ opined that Plaintiff's "lack of compliance with [Dr. Graybiel's] prescribed treatment" suggests "she is capable of significant exertion when motivated to do so" (Tr. 17). However, the ALJ's conclusion is not supported by the record. In noting Plaintiff's non-compliance, Dr. Graybiel documented that Plaintiff needed to "get back on the program" and begin exercising (Tr. 226). As noted above, the recommended exercise program was walking on the treadmill in short intervals. This does not mean that Plaintiff was capable of "significant exertion" and does not provide a basis for disbelieving Plaintiff's testimony.

The ALJ also considered Plaintiff's daily activities in evaluating her credibility. At steps four and five of the evaluation process it is appropriate for the Administrative Law Judge to consider a plaintiff's daily activities. Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987). If daily activities are to be considered, however, the Administrative Law Judge must do so in the context of all of the evidence in the record:

> We have consistently held that in ascertaining whether the [Commissioner's] findings are supported by substantial evidence, we do not consider only those parts of the record that support those findings, but rather must "view the entire record and take account of evidence in the record which detracts from the evidence relied on by the [Commissioner]."

Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986).

The Parker court found the Administrative Law Judge's reliance upon plaintiff's "daily activities" to discount her testimony regarding pain to have been flawed for failure to consider the plaintiff's testimony that she had to lie down after two hours of such work. Id. Similarly, in Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995), the court held that a conclusory citation to a plaintiff's "daily activities" as a basis for disbelieving her testimony regarding pain was insufficient where a medical condition existed that reasonably could have given rise to the pain described, and, although she testified that she cooked and shopped for herself, she had trouble putting on her clothing. Additionally, in Lewis, 125 F.3d at 1441, the court held that participation in "everyday activities of short duration, such as housework or fishing," does not disqualify a plaintiff from disability, so long as such activities are not inconsistent with limitations recommended by the treating physicians.

Here, Plaintiff indicated that she is able to prepare simple meals, perform light housework, drive short distances, and perform light exercise (Tr. 235, 246-47). However, she also testified that

she can perform such activities only on "good days" and that she experiences at least three "bad" days each week (Tr. 246-48), which the ALJ failed to consider.  Moreover, Plaintiff's activities are not inconsistent with limitations recommended by her treating physicians.  Accordingly, Plaintiff's limited activities are not sufficient reason to discount her subjective testimony regarding pain.

Finally, the ALJ noted that Plaintiff may be motivated by secondary gain and, therefore, her testimony was not credible (Tr. 17).  The possibility that a person is motivated by secondary gain exists in all cases where a person is applying for benefits, such as Workers Compensation or Social Security.  Thus, it is not a sound basis for discounting Plaintiff's testimony, as she is no different from any other claimant.

It was within the ALJ's discretion to determine, after listening to Plaintiff's testimony, that her claims of pain and other symptoms were not credible.  *See* Landry v. Heckler, 782 F.2d 1551, 1554 (11th Cir. 1986).  However, the ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place explicit and adequate reasons for rejecting that testimony on the record.  Cannon, 858 F.2d at 1545; MacGregor, 786 F.2d at 1054.  Because the ALJ's reasons for refusing to credit Plaintiff's subjective complaints are not supported by substantial evidence in the record, Plaintiff's testimony must be accepted as true.  Cannon, 858 F.2d at 1545; MacGregor, 786 F.2d at 1054.  On remand, the ALJ must properly consider Plaintiff's subjective complaints in accordance with 20 C.F.R. § 404.1529.  *See also* Holt v. Sullivan, 921 F.2d 1221, 1222-1224 (11th Cir. 1991) (discussing "pain standard" that applies when a claimant attempts to establish disability through his own testimony of pain or other subjective symptoms).

D.  Development of the Record

Plaintiff contends that the ALJ failed to fully and fairly develop the record because: 1) the ALJ should have asked the psychological consultant to provide a statement regarding the onset of Plaintiff's limitations, as well as Plaintiff's ability to do work related activities "as required by the regulations. 20 C.F.R. §404.1519n(c)(6)"; alternatively, the ALJ should have requested a medical advisor to appear and testify at Plaintiff's hearing, and 2) the ALJ should have asked hypothetical questions of the vocational expert (Doc. 9 at 14, 17-18).

The ALJ has a duty to fully and fairly develop the record.  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997); Welch v. Bowen, 854 F.2d 436, 438 (11th Cir. 1988); Cowart v. Schweiker, 662 F.2d 731, 735-36 (11th Cir. 1981).  The obligation to fully and fairly develop the record exists

if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel, as in the instant case. *See* Cowart, 662 F.2d at 735-36. Remand due to a failure to develop the record is only warranted where such a failure is unfair or prejudicial. *See* Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995). In Graham, 129 F.3d at 1423, the court held that the record did not "show the kind of gaps in the evidence necessary to demonstrate prejudice."

A psychological examiner's report should contain the opinion of the examiner regarding a claimant's ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers, and work pressures in a work setting. 20 C.F.R. §404.1519n(c)(6). However, the absence of such a statement, as in the instant case, does not automatically render the report incomplete (*id.*), and the ALJ was not required to obtain such a statement from the examiner (or otherwise further develop the record). As discussed above, the ALJ is required to further develop the record only if it shows "the kind of gaps in the evidence necessary to demonstrate prejudice," Graham, 129 F.3d at 1423. This court concludes that no such gaps exist in the instant case, as reflected in the detailed summary of the record, *supra*.

In particular, the court notes that Dr. Lightfoot documented that Plaintiff's GAF was 60, which indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 157). Additionally, Dr. Speer, an examining physician, documented that Plaintiff's mental limitations affected her ability to function mentally and physically (Tr. 161). Finally, one non-examining source indicated that Plaintiff had mild limitations in activities of daily living and maintaining social functioning, and both non-examining sources indicated Plaintiff had mild difficulty maintaining concentration, persistence, or pace (Tr. 182, 204). Thus, the record in this case is neither incomplete nor inadequate. It includes sufficient information upon which to base a decision and there was no need for the ALJ to further develop the record regarding Plaintiff's ability to perform work-related mental activities.

Finally, Plaintiff asserts that the ALJ failed to fully develop the vocational evidence by failing to ask any hypothetical questions of the vocational expert (Doc. 9 at 17). The ALJ here, however, found that Plaintiff could return to her past relevant work. In light of that finding, the ALJ was not required to obtain VE testimony. *See* Lucas v. Sullivan, 1573 n.2 (11th Cir. 1990) (VE testimony is not necessary where the claimant can return to past relevant work). If on remand the ALJ determines that Plaintiff is not able to perform her past relevant work, use of a vocational expert

may be necessary. *See* Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir.1987).

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to remand this case to the Administrative Law Judge for further proceedings consistent with this report and recommendation, and that the Clerk be directed to close the file.

At Pensacola, Florida this 1st day of February 2006.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**